420 P.2d 970

**J. H. WELSH & SON CONTRACTING COMPANY, Appellant,**

v.

**ARIZONA STATE TAX COMMISSION, Appellee.**

No. 1 CA–CIV 216.

Court of Appeals of Arizona.

Dec. 6, 1966.

Rehearing Denied Dec. 23, 1966.

Review Granted Jan. 11, 1967.

Lewis, Roca, Scoville, Beauchamp & Linton, by John P. Frank and Paul G. Ulrich, Phoenix, for appellant.

Darrell F. Smith, Atty. Gen., by Philip M. Haggerty, Former Asst. Atty. Gen., and Walter O. Holm, Asst. Atty. Gen., for appellee.

ROYLSTON, ROBERT O., Judge of the Superior Court.

In computing the Transaction Privilege Taxes which the Arizona State Tax Commission claimed to be due from the appellant, the Commission declined to permit a credit against the computation based upon claimed "fringe benefit" payments. The Commission levied an assessment. All proper administrative procedures had been accomplished and the appellant filed a timely appeal to the Superior Court pursuant to Section 42–1339, subsec. B, A.R.S. The matter was presented to the Superior Court and a judgment was rendered from which an appeal was taken to the Court of Appeals. The appellant relies upon the same section in relation to the jurisdiction of the Court of Appeals. There are two aspects of the matter now pending in this Court, the first being the jurisdiction of the Court of Appeals and the second being the merits of the appellant's position.

## JURISDICTION

Courts exercising appellate jurisdiction will examine into their power to entertain the matter before them even in the absence of an issue being raised by counsel. Stevens v. Mehagian's Home Furnishings, Inc., 90 Ariz. 42, 365 P.2d 208 (1961); Ginn v. Superior Court, 1 Ariz. App. 455, 404 P.2d 721 (1965); and Searles v. Haldiman, 3 Ariz.App. 294, 413 P.2d 860 (1966). The portion of Subsection B of Section 42–1339 A.R.S. which we have under consideration provides:

"Either party to such action may appeal to the supreme court as provided by law * * *."

There are numerous Arizona Statutory Provisions of like import which authorize the

Superior Court to judicially review the official action taken by executive departments and administrative agencies and which in turn authorize an appeal to the Supreme Court. Illustrative of the Statutes granting the right to appeal to the Supreme Court, are the following sections contained in the Arizona Revised Statutes, followed by a brief description of the subject matter:

20–166, subsec. F Insurance; appeal to supreme court from judgment of superior court as in other civil cases to which the state is a party.

23–682 Labor; final judgment of the superior court in appeals from employment security commission.

27–526 Minerals, Oil & Gas; appeals from superior court reviewing rules, regulations or orders of commission.

30–174 Arizona Power Authority; appeals from superior court review of final orders or actions of Arizona Power Authority.

32–354, subsec. H Barbering; appeal from superior court review of acts of Board of Barber Examiners.

32–1054 Collection Agencies; appeals from superior court review of secretary of state revoking, suspending or refusing to issue a collection agency license.

32–1453, subsec. G Medicine & Surgery; Board of Medical Examiners' final decision subject to review.

32–1554, subsec. C Naturopathy; appeals from superior court review of decisions of Naturopathic Board of Examiners.

32–1665, subsec. D Nursing; appeal from superior court review of decisions of State Nursing Board.

32–1695, subsec. B Dispensing Opticians; appeal from superior court review of State Board of Dispensing Opticians.

32–1857, subsec. B Osteopathic Physicians; appeal from superior court review of decisions of State Osteopathic Board of Registration and Examination in Medicine & Surgery.

36–538, subsec. A Public Health & Safety; review of order of State Board of Medical Examiners relating to sexual sterilization.

37–134 & 37–214, subsec. E Public Lands; appeals from superior court review of decisions of State Land Commissioners and/or Board of Appeals.

37–345 Public Officers & Employees; appeal from superior court judgment of removal of county and precinct officers.

40–254, subsec. D Public Utilities & Carriers; Corporation Commission's orders subject to superior court and supreme court review.

42–147, subsec. E Taxation; appeal from superior court review of decisions of State Board of Equalization or State Tax Commission.

44–1984 Trade & Commerce; appeal from superior court review of orders of Corporation Commission relative to Sales of Securities.

In some instances the Statutes creating the Agency or Division of the Executive Branch of Government were silent in relation to authorizing a judicial review. To meet this void, the Judicial Review of Administrative Divisions Act was passed by the Legislature in the year 1954. This act now appears as Sections 12–901 to 12–914 A.R.S. Subsection A of Section 12–902 states the general purpose of the act is to grant a right of judicial review where no right theretofore existed and Subsection A of Section 12–905 vested the initial judicial review in the Superior Court. By Section 12–913, appellate review was granted to the Supreme Court. The importance of the act in relation to the jurisdictional aspect of the case we are now considering arises from the fact that the Legislature by a general act in effect amended numerous acts relating to specific administrative agen-

cies by granting an otherwise non-existent right of appeal.

This Court was concerned relative to the presence of its jurisdiction in this cause. The attorneys were requested to file briefs relative to the jurisdictional aspect of the matter and we express our appreciation to the attorneys for their aid in resolving this problem.

The Judicial Article of the Arizona Constitution, A.R.S., Article VI, was amended in the year 1960, and the amended article vests the judicial power in an integrated judicial department,

"* * * consisting of * * * such intermediate appellate courts as may be provided by law * * *". Section 1.

Section 9 of the amended article is as follows:

"The jurisdiction, powers, duties and composition of any intermediate appellate court shall be as provided by law".

Pursuant to the constitutional authority, the Court of Appeals was created by Chapter 102 of the Laws of 1964. The act contained a new section being Section 12–120.21 relating to the subject of jurisdiction and venue. Subsection A thereof is captioned:

"The Court of Appeals shall have * *"

and Paragraph 2 is as follows:

"Appellate jurisdiction in all actions and proceedings originating in or permitted by law to be appealed from the superior court, except criminal actions involving crimes punishable by death or life imprisonment."

In relation to this exception, by like language and as a part of Chapter 102, Section 13–1711 was amended and these exceptions are discussed in State v. Mileham, 1 Ariz.App. 67, 399 P.2d 688 (1965). In a recent decision, State of Arizona v. Court of Appeals, 101 Ariz. 166, 416 P.2d 599 (1966), the Arizona Supreme Court pointed out one area of absence of jurisdiction in the Court of Appeals.

■■ It is our opinion that the initial appellate court jurisdiction can be trans-ferred from the Supreme Court to the Court of Appeals by the general language contained in the above quoted portion of Section 12–120.21 unless a clear intent to the contrary appears. In the case of Industrial Commission v. Harbor Insurance Company, 4 Ariz.App. 405, 420 P.2d 977, decided this day, we consider statutes wherein we concluded that a contrary intent is clearly expressed. Amendments by implication are sustained when the intent is clear. Rowland v. McBride, 35 Ariz. 511, 381 P. 207 (1929); Arizona Corporation Commission v. Catalina Foothills Estates, 78 Ariz. 245, 278 P.2d 427 (1954). We deem it significant that in relation to certain criminal cases there was an express denial of jurisdiction in the Court of Appeals which is absent in relation to the civil jurisdiction. It is also significant that Chapter 102 continues the Supreme Court's jurisdiction by providing a method of seeking review of the opinions of the Court of Appeals as more particularly appears in Section 12–120.24 A.R.S.

It is our opinion, and we expressly hold, that we have jurisdiction in this case.

## THE MERITS OF THE CONTROVERSY

The position of Appellant Welsh is representative of many hundreds of contractors who employ union labor in the State of Arizona. Their employees are employed under labor agreements normally negotiated by trade associations on behalf of the contractors and by the unions in behalf of the employees. These payments include, first, payments made directly to the employees, usually amounting to about 80–90% of the total payment and referred to as direct payments; and second, payments made for the benefit of the employees and the industry in which they are employed, such as health and welfare payments, vacation allowances, promotional fund payments, pension payments, or others. These are normally made to various trusts and are commonly identified as "fringe benefits".

"Fringe benefits" are payments made to various trust funds in addition to the normal "straight" or "conventional" pay that the employee receives in hand on payday, puts into his pocket and spends. Since the end of World War II the practice has arisen not only in Phoenix but throughout the United States of adding to these base payments the additional fringe payments. These payments are for different purposes. One of the earliest benefits established was for purposes of promoting health and welfare. A certain amount of money is paid per hour worked by each employee to a bank, which receives the money and establishes an insurance program for the individual so that the person at that time receives an insurance benefit of the value of those dollars.

Two other types of "fringe benefits" that have become common in the Phoenix area in recent years are the pension fund and the vacation fund. A certain amount per hour of work is put into a bank account for vacation purposes; the employee receives this money in his hand at the time of his vacation. This is simply a forced savings device, so that in this manner the employee gets the identical dollars directly paid back to him.

Pension fund benefits are based upon the period of service by an employee. After twenty years service, an employee is entitled to full benefits upon retirement.

Another type is for payments to funds used for apprenticeship purposes. An apprenticeship fund is maintained so that there may be new persons to work in the trade. These payments are also calculated on a per hour basis. Industry promotional funds are another type of benefit. In these, funds are used to see that there will be work to be done in the future.

The statute whose interpretation is at issue in this case is Section 42–1310 A.R.S., which reads in relevant part:

"The tax imposed by subsection A of § 42–1309 shall be levied and collected at the following rates:

   *     *     *     *     *     *

"(2) At an amount equal to one per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the following businesses:

   *     *     *     *     *     *

"(i) Contracting, but payments paid by the contractor for labor employed in construction, improvements or repairs, shall not be subject to such tax."

Prior to commencement of this action, the Commission promulgated Regulation 2.15.8 to define this section:

"(Contracting). Other deductions.— Other deductions from gross proceeds or gross income allotted to a contractor are: (a) amounts paid to a sub-contractor, who is duly licensed as a contractor and also holds a transaction privilege tax license, and (b) subsistence, labor taxes and insurance, including social security, industrial insurance, and workmen's compensation payments made by the contractor on direct payments to laborers."

In written instructions made available to taxpayers generally sometime between 1959 and 1961, the Commission had taken the position that union welfare and other fringe benefits were not deductible.

Acting under this regulation and these instructions, the Commission has demanded that taxes be paid on amounts paid as fringe benefits. Such a demand was made upon the contractor who is appellant here. A determination was made by the Commission of the amount of tax owing by appellant on the assumption that fringe benefits were not deductible in calculating the taxes required to be paid. The individual contractor duly appealed to the Commission in accordance with Section 42–1338 A.R.S.

The Commission decided the matter against the taxpayer. The tax determined to be due was immediately paid under protest.

Following payment of the tax, appellants filed with the Maricopa County Superior Court an amended complaint alleging that

the Commission regulation quoted above was invalid, seeking refund of the tax paid under protest and seeking a declaratory judgment that amounts paid to those funds were not subject to tax. Following the introduction of evidence, oral argument, and submission of briefs by the parties, the Court ordered that appellant recover of the Commission the sum representing the tax attributable to the vacation, health-welfare, and pension funds.

The Court also entered the declaratory judgment requested by plaintiffs that contributions to vacation, health-welfare, and pension funds were not subject to tax.

This appeal is from that portion of the judgment entered by the Superior Court reading:

"It is further. ordered, adjudged and decreed. that such portion of the amounts claimed by the plaintiff as paid to those fringe benefits known as Apprenticeship or Industry Promotion Funds are not 'payments paid by the contractor for labor employed in construction' and are not deductible in calculating the tax; and as to these the plaintiff shall take nothing."

No cross-appeal has been taken by the Commission from those portions of the judgment entered in favor of the plaintiffs.

Thus, the question presented is as follows: Are certain "fringe benefits" that are paid by employers in the construction industry, under the provisions of collective bargaining agreements, to trust funds created to finance programs for apprenticeship training and industry promotion amounts "paid by the contractor for labor" and hence deductible under Section 42–1310, subsec. 2, par. i A.R.S from the privilege and education excise tax provided by Section 42–1301 et seq. A.R.S.?

Appellant's primary position is that the testimony, from both union and management representatives, uniformly shows that the issues posed by fringe benefits have been at the center of contract negotiations in recent years, that the unions have accepted fringe benefit payments in lieu of direct wage increases, that union representatives are in favor of wage increases taking this form, anticipating that this trend will become more pronounced in the future, and that these payments are considered to be direct wage costs of the employers.

The appellant herein is attempting to claim the benefit of an exclusion or exemption, and the general rule is that every interpretation shall be against exemptions from taxation statutes. Conrad v. Maricopa County, 40 Ariz. 390, 12 P.2d 613 (1932); Oglesby v. Poage, 45 Ariz. 23, 40 P.2d 90 (1935); State v. Yuma Irrigation District, 55 Ariz. 178, 99 P.2d 704 (1940); Arizona State Tax Commission v. Frank Harmonson Company Metal Products, 63 Ariz. 452, 163 P.2d 667 (1945).

To refer specifically to the testimony in the case, and to bring to bear the exact issues involved, let us first consider the industry promotion fund. This is a fund to which contributions are made by those contractors who happen to be members of a contractor's association. They base the contributions on the number of man-hours worked, and as the testimony indicates, this is a method of equalizing assessments among contractors of various sizes. The fund itself is administered by trustees, all of whom are members of the contracting industry, plus one public member. Labor Union officials are permitted to be observers, but by provisions of the Taft-Hartley Act, they may not be trustees of the fund. The proceeds of the fund are expended on such items as trade papers, bulletins concerning the industry in general, and educational programs for employees of the contractors at the management level as well as on the construction level. It was stated that a large amount of effort was spent in enforcement of laws affecting the industry, requiring strict adherence to public health and safety codes, etc. It was also stated quite clearly that funds were used to influence legislation favorable to the industry, and frankly to pay lobbyists.

While it is apparent that if the industry promotional funds are successfully used, the industry as a whole will benefit, and some of the individual laborers employed by contractors will receive future benefit through perhaps increased employment or better working conditions, it is difficult to say that this is a "cost for labor employed in construction". It bears no relation to the actual men on the job, and as the testimony shows, they receive no direct benefits. A portion of the testimony was as follows:

"Q. But there is no one person who can say, 'I have a vested interest in, or a right to demand something in dollars and cents from this fund'?

"A. No.

"Q. Compared to a pension or welfare or vacation fund?

"A. That is right."

While contributions to this fund might be considered a cost item for contractors in general of the overall operation of their business, it does not appear that it is a "cost for labor employed in construction". It bears no relation to the actual jobs that may or may not be in progress and really remains part of the overhead of the contracting business.

If we leave the question of industry promotion funds aside and turn to apprenticeship funds, we have considerable testimony on exactly what these funds are for. These funds are collected along with the industry promotional funds as a single fund, and afterwards separated into two funds. The method of separation is not material here. An employee does not receive any cash or direct benefit himself as a result of an apprenticeship fund. Further testimony is to the effect that an apprentice may or may not ever go to work as a journeyman for any particular contractor, and that the amount paid into the fund bears no relationship to whether or not apprentices are actually working on any construction contract. The general purpose of such apprenticeship funds is to train a future pool of workers in a particular craft or trade. While it is admirable and while it is certainly an item of cost to be considered in the management of a contracting business, it is not money paid "for labor employed in construction". The money does not go in any form as either direct wages or pension or vacation or welfare plans to any of the employees actually working on a job.

Although there are payments which do not go directly to the workers, such as social security, unemployment compensation, industrial insurance, welfare, pension and vacation plans, these are directly related to the workers on the job, and, therefore, can be considered a cost for that labor employed in that construction. It does not necessarily follow that payments made to a fund which only indirectly benefit the individual laborers as a class and not as individuals, can be considered part of the same deductible cost. The appellant would have us read into the statute language which would make it appear as follows:

"Costs for labor which may in the future time be employed in construction somewhere by perhaps some other contractor,"

in the case of the apprentice situation; and insofar as industry promotion funds are concerned, the statute would have to read:

"Costs for promotional work which may in some manner benefit the laborers employed in construction."

We feel that the Legislature wished to limit the deduction to the actual amounts of money spent for the benefit of, or directly to, the men working on the job, and not to cover every conceivable expense of a contractor which may in some way arise out of the fact that he has to use employees to conduct the contracting business. We do not believe that advertising, educational, law enforcement or lobbying expenses are "costs for labor employed in construction". Nor do we believe that costs to teach people who are not actually

employed should be considered "costs for labor employed in construction".

The judgment of the trial court is affirmed.

STEVENS, C. J., and DONOFRIO, J., concur.

NOTE: Judge JAMES DUKE CAMERON having requested that he be relieved from the consideration of this matter, Superior Court Judge ROBERT O. ROYLSTON was called to sit in his stead and participate in the determination of this cause.